United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Well, good morning and welcome to the Ninth Circuit. I'm Judge Nelson and it's been a pleasure to sit with my colleagues, Judge Hawkins and Judge Forrest, this week. We'd like to welcome counsel who will be arguing today remotely and we look forward to welcoming you in person soon. We ask that during argument you please watch your time, keep to your allotted time frames and sum up your argument as time is concluding and let us know if you want to reserve time for rebuttal. We're ready to proceed with oral argument. The calendar, we have three cases that have been submitted. Lee v. Garland, case number 20-72468. Lee v. Garland, case number 20-72691. And Chavez v. Deutsche Bank National Trust Company, case number 21-15599. We have one case scheduled for argument this morning and that is United States v. Williams, case number 20-10354. And we'll first hear from Ms. Dotson. There we go. Ms. Dotson, you may proceed. Good morning, Your Honors. Deanna Dotson. May it please the Court that I'll be representing a felon, Anthony Williams, in this case. Excuse me. I'm going to be addressing the issue about the jurors, one particular juror, and I'm going to refer to that juror as juror number five. The first day of the perspective jurors being into the room, 32 were put in the box for voir dire and number five was part of that 32. When they were in the box, the judge explained to them briefly about the indictment, stating that Anthony Williams, in the name of his company, Mortgage Enterprise Investments and Law Office, Common Law Office of America, and also said that he was charged with wire frauds and mail frauds. And then the court asked the first voir dire question. The question was, does anyone have any personal knowledge of the facts or events of the case that I've just described to you? Anyone familiar with it, read it in a newspaper, have friends who talked about it? And there were no responses by the 32 perspective jurors, including juror number five. And the problem with this is, is that juror number five had information about Anthony Williams, about his companies, and she had the actual brochures in her home. The brochures were submitted the first morning of the trial, as Exhibits 144 and 145. Was that ever established? My understanding from the questioning is that she thought it was the same company. Was it ever established that whatever she had at home actually was, with regard to Mr. Williams' company? Yes. You know, I'm not seeing you. I'm seeing Mr. Yates on the big screen. I'm sorry. Can you hear us? I can hear you, but it's not as loud. But you're not on the big screen, so I can't really see you. You're a little thumbnail up at the top. So I don't know why. Would you like us to... The brochures that were presented, it had his name, and she did say she had the brochures in her home. Okay, now I can see you. Thank you. Okay. She said that she had those brochures, and she was familiar with it. She even stated that her daughter was trying to maybe find a job with one of those companies. And juror number five stated that she had received emails about mortgages. But I thought that there was further testimony that it couldn't have been his company because he didn't hire any externs. Well, it could have been because he had an office in New York, and she was in school in New Jersey. And you can go and work in New York. So that really wasn't... That wasn't really clear, but she could have applied for a position in his company in New York. He did have an office there. Counsel, Mr. Williams was representing himself, correct? Correct. And he was given an opportunity to question juror number five? Well, you know, being... I don't think... Well, she didn't answer any questions. And so you can only... The judge is the one that gave the voir dire questions, and she didn't respond to that first one. Well, but this didn't come up... And then when they were going through this questioning... Ms. Dodson, this... You come back to that she didn't respond to the voir dire question, but this issue didn't come up until after voir dire, right? After she was a juror, correct. However, she already had that information, and she should have responded to that question. She already knew about it. Her and her daughter had been discussing it, and she had the brochures in her home. In fact, she said one of the questions during the time that she was questioned, you know, after the first break during the first day of trial, she said, well, I can go home, and I'm sure I can find those brochures. So she did have that information. But back to Judge Hawkins' question, why... Your client had the opportunity to ask questions, and he didn't. So what effect does that have? At a minimum, doesn't that make our review more deferential? Well, I don't think... Being pro per, I don't think he realized that he could ask the questions, because really, the judge was asking most of the questions. He's a lawyer, or was. No, he was never a lawyer. He made himself out to be an attorney, but he never was. And he really didn't understand this voir dire, and he didn't really understand the questioning that was going on. And when he brought up... The district court had given him access to counsel, hadn't they? Hadn't the district court done that? Only standby counsel, but standby counsel is not permitted to do the job of an attorney. He sat there during jury selection and just helped him, you know, decide which ones to release for cause and so forth. But he couldn't ask any questions, and he couldn't give any advice. Well, I don't know if that's true. Particularly during this time. It was only standby counsel, because that's what he wanted. He wanted to represent himself. That was a choice he made. Correct. So it wasn't that he was forced into a procedure where he couldn't be represented or couldn't ask questions. He chose this procedure, right? No, that's true. He chose it. But just because he chose that, I don't think that's fair that he has a juror that might be... that's not impartial. And going through the... that A, his company didn't produce brochures, and B, they didn't hire interns. Is that correct? No, I don't recall him saying he didn't produce brochures, because those brochures were presented. His brochures were presented as the evidence. That's Excerpts of Record 144 and 145. Those are his brochures, and he did produce those. But he said that he didn't have an office in New Jersey, but he said he did have one in New York. So there was still... But, you know, Mr. Williams was a person that was, I guess you'd say, full of himself. And I think when the comment was made that the daughter wanted to find a job with his company, I think he was like, oh, good, you want to work for my company. I don't think he realized what was really going on during these questions about how, really, how dangerous it was to his situation that this juror would stay on the jury. Let's go to the bottom line here. The juror ultimately answered that she could keep an open mind during the trial. Why isn't that enough? In most cases, we've held that that is enough, as long as the juror says that they can keep an open mind to... Okay, could I go through that? Sure. Actually, starting at page 44 is when the U.S. attorney asked the first question about being impartial. The problem was that all the questions asked by the court, the judge, and him, they were compound questions. And so when he asked her about being impartial, she said, well, you know, what can I... I won't discuss it. Can I send her an email? She didn't get the point about being impartial. And every time she was asked that, that was the same thing. So the question that was asked before she said, I will, again, was... The U.S. attorney brought it up, saying that she hasn't answered any questions. She hasn't stated she could be impartial. So the court asked the question again. And before she asked the question, she said, you know, we've covered all this, but you can't talk to her about the case until it's over. And then she said, and I asked her a little bit earlier, which is because you saw this pamphlet in your daughter's bedroom, and she may have emailed you or texted you about it. Do you think that's going to affect your ability to be open-minded until all the evidence comes in? And to be fair to both the government and Mr. Williams. And she said, I think I can. Counsel, before you run out of time, can we turn to the law? Has the Ninth Circuit ever presumed bias in a once-removed existing employment relationship, assuming there was a potential employment relationship? Is there a Ninth Circuit case that said, in that circumstance, you must presume bias? The answer is no. Actually, I don't recall a case like that. But I think you can presume bias if she has that information, and she never really said even that I will. It's I will, I will wait and listen to all the evidence, and we'll get in the jury room to decide the case. It's not about being impartial. But now you're mixing it up. That's the actual bias. Judge Hawkins is asking about implied bias. And do you think that there is a case that supports your implied bias claim? Because if we found implied bias here, let's assume we don't accept your actual bias argument. If we held for implied bias here, we'd be extending Ninth Circuit law, wouldn't we? Yes, and I think really, I think in the Gonzalez case, I think that was about also implied bias. Well, it was about implied bias, but there you had a much closer relationship. Right, I mean relationship with what? With the actual juror as opposed to a family member of the juror. Well, yes, all the cases. I don't think there is a case that say about like this case. She never was questioned during voir dire so that they couldn't bring out anything. She just was on the jury. And then she brings up, but I believe that the Gonzalez case did go over that it was, they said they would have it either under express or implied theory. Counsel, you've used up your time. We'll give you a minute for rebuttal, and we'll turn the time over to the United States. Mr. Yates. Good morning, Your Honors. May it please the Court. Greg Yates for the appellee, United States. I'm going to focus my discussion on the issue of actual biases that appears to be of primary concern to Your Honors. As the Court has acknowledged this morning, all that is ultimately required is for the juror to affirm that she can be fair and impartial. The record is admittedly confused, confusing, and disjointed, and there's a reason for that. As noted in the opening brief, this colloquy that is the subject and the basis of the first ground of the appeal took place on the very first day of testimony, just after a few hours of the presentation of the government. The very first witness, FBI agent Megan Crawley, had only begun to testify regarding the mortgage fraud scheme perpetrated by Anthony Williams, and she had only begun to talk about the entities used by Anthony Williams to perpetrate this mortgage fraud scheme, including the Common Law Office of America. That is in the record before this Court. And Megan Crawley testified that Common Law Office of America was a law firm that had no actual attorneys, that it produced brochures that listed four names on them, one of which was Anthony Williams and another was a pseudonym for Anthony Williams. And the impression given after these few hours of testimony was that the Common Law Office of America was a criminal enterprise. And it was in that context that juror number five raised a concern, because juror number five was the mother of a college-aged daughter who was applying for or would be applying for internships sometime in the near future. And again, thinking of the timing, juror number five was just selected the day before on February 3rd. The jurors were all just instructed that they were not to communicate relating to the substance of the trial with anyone. And then she began hearing evidence the following morning, evidence of a conspiracy, excuse me, of a criminal enterprise, and she was concerned that her daughter might be applying for an internship with this entity. Yes? Based on the record, is it the government's position that we should assume or presume that the pamphlets that juror number five had at home actually were for Mr. Williams' company? So, no, Your Honor, and that's an important point. The juror is not clear as to what she saw. And I believe Your Honor did raise this in questioning earlier. The AUSA put the question directly to juror number five if she had actually seen the specific brochures. And when the question was put to her, did you actually see a placard or some type of brochure, that was the actual question, the juror walks back and says, I think I did. I'm not real sure, but I think I did. And then she ends with, but I'm not 100 percent. It's actually not so important that we establish whether she had actually seen these brochures or not. The strongest argument for the defendant is that her mere concern for her daughter produces the potential for some kind of bias. We acknowledge that the juror number five was concerned for her daughter. That's not an issue. But for the purposes of the actual bias analysis, what matters is whether the juror can put aside her concerns and remain fair and impartial. That's the reason why it is so important that there's a colloquy at the end. The colloquy until the final questions are confused because the juror is concerned with what she can ask her daughter. The juror is concerned that her daughter might be applying for an internship that might be a part of a criminal enterprise, and she would like to talk to her daughter about that. And she was just instructed to not say anything about the substance of the trial. So her concern in raising questions to the court is, what can I say to my daughter? The court is concerned with the actual bias analysis and is turning the questioning into a colloquy as to whether the juror can be fair and impartial. So in some ways, the two, the juror and the court, are talking past each other. The court asks whether the juror can be fair and impartial, and the juror responds with, you know, what can I tell my daughter? But ultimately, the AUSA and the court ask the juror whether she can be fair and impartial, and she says, I think I can. I can. As the court is well aware, under the Alexander case, an equivocal statement followed by an unequivocal statement of fairness and impartiality is sufficient to establish that a juror can be fair and impartial. Actually, counsel, her response to the district court's question was, yes, I will. The second, and that is a very good point. It was the first thing she said was, and I'll read the entire response because I think it's important. The question was, do you think that's going to affect your ability to be open-minded until all the evidence comes in and to be fair to both the government and Mr. Williams in listening to all of the evidence? I think I can. I can. And then the district court, just as Your Honor has pointed out, makes a fine point of it and says both sides have the right to have jurors who are going to use their best effort to keep an open mind, wait until all the evidence is in, and until they sit down with their fellow jurors to discuss the case. Is this something that you can promise us that you will do? And the juror says, yes, I will. That is all that is required under the case law of Alexander, under Kitschitzian, and the Gonzalez case, which admittedly is an implied bias case, but which runs through the same analysis. This is not a case of equivocal statements made and relied upon. Although there were equivocal statements made earlier by the juror, the Alexander case makes clear that the district court need not rely on an initial response. It's the final response that matters. Can I tune you quickly to the veneer composition? Here there were no African-Americans in the jury pool. I understand the government's argument that the statistical analysis was not done in this case. Is it also the government's position that that just couldn't be done here because African-Americans make up such a small percentage of the population in Hawaii? Or is there something that could have, could this case have been made out that there was something unfair about the jury selection here? I believe that the record could have been developed by the defendant. The defendant clearly did not do that here. So some points that I would like to make. Part of the reason the defendant did not build the record, in addition to the fact that the defendant was, as put earlier, full of himself and convinced of his own persuasive powers, is that he made actually a different argument before the district court. What the defendant was saying was that there were no African-Americans who showed up on the day of the jury veneer. The analysis for the purposes of a jury pulled from a fair cross-section of the community is to compare the jury pool as a whole to the community at large. And even pro se defendants can make that argument. And in fact, the case of Rodriguez-Lara, which is cited in the briefs, specifically involved a pro se defendant who pointed out the percentage of, I believe it was Hispanic-Americans within the community, and then called for, asked for jury information from the court, received it, and demonstrated an under-representation of Hispanic-Americans. That didn't happen here. And the reason it didn't is because Mr. Williams was making a different argument to the district court. He was saying not that the jury pool from which jury veneers are pulled was under-representing African-Americans compared to the community. He was saying not enough African-Americans showed up today, Your Honor. And as noted in the briefs, that's not really an argument he can make because really it's not entirely clear that there were no African-Americans who were present. And I want to be very careful that I'm not speaking beyond the record, but the record is clear that he had access to information that would have given him knowledge of the racial composition of the pool because jury cards were made available to the parties. That's in the record. In the docket at ECF, I believe, please forgive me, Your Honors. It was, I believe it, I don't have the site momentarily. That's okay. It's at ECF 840. Okay. Yes. I see my time has expired. If I might briefly conclude, he could have made some record from which to make an argument, and that record is not present here. For the reasons stated and in the briefs, Your Honors, the government respectfully requests that the judgment below be affirmed. Thank you, Your Honor. Thank you, counsel. And we'll give Ms. Dodson one minute for rebuttal. Sorry, Your Honor. I had to unmute everything. I'd just like to comment about one of the last statements that Mr. Yates stated. When they were selecting the jury, they were given information, and it was in one of my footnotes, but I can't find it right now, but they were given information about all the members of the jury pool. There were 84 that were in the pool that day, and there were no Hispanics or African, black African-Americans in that jury pool at all. And so that's why there is an argument. Mr. Williams, again, I mean, not a lot of people know about the fair cross-section rule or how to go about getting statistics, but just looking at the demographics of Hawaii themselves, if you just take the driver's license and voter registration list, that's not going to take a lot of people because a lot of people in Hawaii don't drive. They can't afford a car, they can't afford to drive, and the bus system is very good. And so, and there are other ways. They could do the ID because everybody has to have an ID, and they could do a personal ID, they could draw from that, and driver's license. So then you'd have a variety of it. Also, I'd like to state one other thing about on the jury selection. The juror did know because when she mentioned that she was in conflict, and so the court asked, well, did you see this, that there was an internship? And she said, yeah, but I remember seeing that flyer. And so she said that has nothing to do with Common Law Office of America. No, it does. I saw the flyer in her room with Common Law Office. And so she had several other, I don't have time to go through them, several other comments through that that she had the information, she had the brochures, and the majority of her answers were concerned about what can I tell my daughter, what can I talk to her about, not that I'm impartial. And I think that last answer, yes, I will, it was I'll wait until we get in the jury room, and then we'll talk about it, but not that she was impartial. Counsel, I think we have your argument, and we appreciate the argument on both sides today. And this case is submitted, and the court is done for the day for arguments. Thank you, Your Honors. All rise.
judges: HAWKINS, NELSON, FORREST